UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JULIA HAMMER,

                        Plaintiff,

   -against-

TRADER JOE'S COMPANY,

                        Defendant.

Case No.:

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Julia Hammer, by her attorneys, Crumiller P.C., as and for her Complaint against Defendant Trader Joe's Company ("Trader Joe's" or "the Company"), alleges as follows:

### PRELIMINARY STATEMENT

1. Trader Joe's is a supermarket chain that proclaims itself to be highly dedicated to its employees, as exemplified by its rate of pay, exceptional benefits, and progressive culture. The Company prides itself on maintaining a work environment that is "safe, welcoming, inclusive, and respectful for all Crew Members and customers."[1]

2. Unfortunately, Trader Joe's' treatment of working women is far from "safe" or "respectful."

3. When Julia Hammer returned from maternity leave and requested a private and clean lactation space to pump breastmilk, Trader Joe's flounced its obligations under New York law and pointed Hammer to a dirty, multipurpose mechanical room that lacked a suitable lock.

4. Hammer had no choice but to pump in this mechanical room. Hammer was tense and on edge, terrified that she would be interrupted while pumping. On one occasion her worst fear came to fruition when a male manager walked in on her, seeing her completely exposed.

---

[1] *See* https://www.traderjoes.com/home/diversity-inclusion (last accessed September 12, 2023).

5.      On other occasions, Hammer tried to use the room to pump on her pumping schedule, only to find it occupied by other Trader Joe's employees conducting interviews or doing administrative tasks. She had nowhere to go to safely relieve the physical discomfort caused by deviating from her pumping schedule.

6.      Hammer complained to her manager, who laughed it off and refused to help her.

7.      Finally, Trader Joe's retaliated against Hammer for taking maternity leave by revoking her healthcare coverage under the guise that Hammer did not meet the required number of hours to be eligible for her entitled benefits.

8.      Therefore, Hammer, by her attorneys, Crumiller P.C., brings this action against Defendant Trader Joe's to remedy claims of pregnancy discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Pregnancy Discrimination Act of 1978; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et. seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et. seq.*

**PARTIES**

9.      Plaintiff Julia Hammer is a 42-year-old mother who resides in Nassau County, New York. Hammer is a former employee of Trader Joe's in its Lower East Side, Manhattan location and Long Island City, Queens location.

10.     Defendant Trader Joe's is a chain of grocery stores with over 530 locations across the United States. Trader Joe's is incorporated and headquartered in Monrovia, California, and has over 50,000 employees.

## JURISDICTION AND VENUE

11. This Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367.

12. Venue is proper in the Eastern District of New York pursuant to 29 U.S.C. § 1391 because the events on which the claims asserted herein occurred in Long Island City, New York, which is in this District.

## FACTUAL ALLEGATIONS

*Background*

13. On October 19, 2018, Julia Hammer began her employment as a "Crew Member" at the Trader Joe's location in Lower East Side ("LES"), Manhattan.

14. In her role, Hammer stocked and organized shelves, assisted customers with finding products, rang customers up at the cash register, and unloaded trucks early in the morning.

15. Hammer worked hard and was routinely praised for her work. She received glowing reviews from her superiors. In late 2019, Hammer took on additional responsibilities outside the scope of her role and joined Trader Joe's' "art team," which assisted in creating Trader Joe's' signature handwritten signs. Indeed, Hammer was a very successful employee by all accounts.

16. In December 2019, Hammer and her wife decided to grow their family. Thereafter, Hammer engaged in an intensive insemination process: she underwent three rounds of intrauterine insemination for which she had to routinely inject herself with hormones.

17. In March 2020, New York was thrown into complete chaos. The COVID-19 virus raged through the city, and although many institutions temporarily closed or took safety precautions to protect their employees, Trader Joe's failed to immediately respond. Hammer was extremely

fearful of contracting COVID-19 and felt that she was particularly vulnerable because of her asthma. Additionally, she feared that contracting COVID-19 might jeopardize her ongoing insemination process.

18. Hammer also felt uncomfortable by Trader Joe's' failure to implement basic safety policies. For example, Trader Joe's did not enforce mask wearing or social distancing in the first few months of the pandemic, despite COVID-19's enormous presence in New York City and the lack of testing, vaccination, or treatment. As an employee who was exposed to countless people on a daily basis, Hammer felt that Trader Joe's recklessly risked the safety of its employees for the sake of business.

19. By the end of March 2020, it was clear that the COVID-19 virus was a serious, if not fatal, health issue. At this point, Hammer no longer felt comfortable being exposed to so many people on a daily basis and took a leave of absence from work.

20. In July 2020, unable to afford any additional leave, Hammer returned to Trader Joe's as an essential employee. While her friends stayed hunkered down in their apartments, Hammer ensured that New Yorkers had access to groceries and other essential items.

21. On July 31, 2020, Hammer was thrilled to learn that she was finally pregnant.

***Hammer Discloses Her Pregnancy and is Subjected to Discriminatory Treatment***

22. In October 2020, Hammer disclosed her pregnancy to her manager and the store's "Captain" (Trader Joe's' term for its senior managers), Renee Liebowitz ("Liebowitz").

23. Liebowitz appeared supportive but did not provide Hammer with information on Trader Joe's' maternity leave policies, leave under the Family Medical Leave Act ("FMLA"), and/or policies regarding pregnancy-related accommodation requests.

24. During an ultrasound examination early on in her pregnancy, Hammer's doctor found a cyst on one of her ovaries. Hammer's doctor advised her to avoid heavy lifting to maintain her health and the health of her unborn child.

25. As a Crew Member, Hammer regularly lifted boxes and stood for long periods of time as she was required to restock the shelves and check out customers at the register. To that end, Hammer had her doctor write a note advising Trader Joe's that she should not lift heavy items or engage in other strenuous activity.

26. Hammer gave the doctor's note to Liebowitz, who reassigned her to "transitional duty," relieving Hammer from performing laborious job duties such as unloading and restocking.

27. Hammer tried to follow her doctor's advice and avoid strenuous activity while on the job.

28. On one particular day, while Hammer was working the "bouncer position," a role that entailed counting shoppers as they came into the building to maintain COVID-19 capacity restriction guidelines, she felt extremely fatigued. She had swollen ankles, hot flashes, and found it difficult to breathe through her mask. Instead of standing by the storefront windows, Hammer sat on a ledge nearby where she still had the same view of shoppers and could act as a bouncer. Not even 10 minutes after she sat down, Manager Anthony Allison ("Allison") approached her and angrily scolded her, telling her she could not "sit down."

29. Hammer explained that she only needed a short time to rest, and she would continue to stand for the remainder of her 8-hour shift. Allison callously responded, "[y]ou can't stay like that for the whole hour of bouncer duty." Even though Hammer clearly could continue to count the incoming customers from her seated position, she was forced to resume her position directly in front of the windows and stand on her feet.[2]

---

[2] Trader Joe's had no on-site Human Resources ("HR") personnel and she did not know of an HR representative that

30. Allison was unwilling to engage in any interactive dialogue to attempt to accommodate her. With a baby on the way, Hammer did not want to upset her superior and put her job at risk. At such a crucial time, she was terrified of losing her income and insurance. Therefore, she was too afraid to push back or request any further accommodation.

31. Hammer's coworkers also made numerous discriminatory and offensive comments to her about pregnancy and childbirth. For example, upon Hammer's pregnancy announcement, Ashley King ("King"), a Crew Member, stated, "I can't imagine what it's like to have a baby inside you. It must feel like an alien." She then repeatedly asked Hammer, "[h]ow is the alien doing today?" Hammer was extremely offended that her colleague referred to her unborn child as an "alien," as if Hammer had conceived of her child or carried her child in some sort of abnormal or nonhuman way.

32. Upon information and belief, King did not refer to any of her heterosexual, pregnant coworkers, all of whom conceived their children without intrauterine insemination, as having an "alien" inside them.[3]

33. Another crew member, Gwen [last name unknown], gave Hammer unsolicited and bizarre opinions on childbirth. Not once did Hammer ask or bring up her pregnancy for discussion, however, Gwen routinely made comments comparing childbirth to "pooping," and explicitly said, "[i]t's like the biggest poop you've ever taken." Hammer was disgusted and only wished to maintain professional conversations in her workplace. Furthermore, she was deeply

---

she could contact to request an accommodation.

[3] Hammer is aware of four other Trader Joe's employees who were pregnant during her employment. These women did not require any accommodations. Of these four women, three of them did not return to their employment at Trader Joe's postpartum, and the one who did return to Trader Joe's did not return to the Trader Joe's LES store, and instead switched to a different location.

upset that she was inundated with advice on her upcoming childbirth with her coworker's references to bowel movements.

34. In April 2021, shortly before she gave birth, Hammer requested and received a transfer to Trader Joe's' new Long Island City ("LIC") location in Queens.

35. On April 5, 2021, Hammer commenced her maternity leave. While on leave, Hammer did not receive any pay from Trader Joe's. For the first six weeks of leave, Hammer was covered under New York State Disability and received disability pay; and for the next twelve weeks, Hammer was covered under the New York State Paid Family Leave Act and was paid $454 per week.

***Trader Joe's Fails to Provide Hammer an Adequate Lactation Room***

36. In August 2021, Hammer returned from maternity leave. She was eager and excited to return to work, and particularly looked forward to a fresh start at Trader Joe's' newest location in Long Island City. This impressive, 17,000 square foot location was constructed in 2021 and currently employs approximately 125 employees.

37. On her first day, Hammer disclosed to her new manager, Anthony Antonik, that she intended to breastfeed her newborn, and therefore needed a private space to pump breastmilk during the workday.

38. Antonik informed her that Trader Joe's' recently constructed facility did not have a lactation room, and instead suggested that Hammer use the building's mechanical room as a substitute. Upon inspection, Hammer found this mechanical room did not have a table on which she could set a breast pump, there was no sink or access to running water, there was no refrigerator, and there was no suitable lock on the door. Furthermore, the room was dusty and appeared as though it had not been cleaned in weeks.

39. Hammer had no choice but to make use of this room:



40. When using the mechanical room, she had to hustle back and forth between the mechanical room and the women's bathroom, with the nearest sink, which was a walk away. Additionally, there was no refrigerator in the mechanical room for Hammer to store her breastmilk, so Hammer was forced to store her breastmilk in the refrigerator in the employee breakroom. She felt very uncomfortable storing her breastmilk in such a public area, for all her new coworkers to see. Additionally, she worried that storing her breastmilk in a refrigerator next to her colleagues' lunches was unsanitary.

41. Significantly, the mechanical room lacked a proper lock for employees who needed privacy. Hammer could not lock the door to keep outsiders from bursting in on her and any employee who had a key could walk in on her at any moment.

42. After complaining multiple times about the room's lack of privacy, a couple of Hammer's coworkers kindly created a sign for her to hang on the door. However, the sign often fell off the door handle and therefore was out of sight.

43. Hammer was plagued by constant fear of her coworkers walking in on her while she was pumping. Her fear that her coworkers could see her exposed caused her to rush to express milk and get her clothes back on as fast as possible.

44. The mechanical room had several purposes in addition to serving as a lactation space: it was used to store the facility's machinery (which needed to be routinely checked or adjusted), but it was also used as a prayer space, an office space, and an interview room for potential employees. The multi-purpose nature of this space resulted in its constant use and Hammer found that it was often unavailable when she needed to pump.

45. On several occasions, Hammer tried to use the mechanical room during breaks to pump but found that the room was in use for another purpose.

46. Trader Joe's failed to set forth any scheduling system or priority access for Hammer, leaving her helpless when she was scheduled to pump.

47. With nowhere to pump, Hammer simply had to wait until the next time she was able to pump. In addition to losing precious milk, she experienced pain in her breasts from clogged milk ducts. Hammer purchased natural supplements to alleviate the pain and unclog her milk ducts.

48. Furthermore, on several occasions during the workday when she needed to pump but could not, her breastmilk leaked through her clothing. Hammer was humiliated and suffered the embarrassment of having to surreptitiously change her clothing, which was damp and stained with breastmilk.

49. On November 10, 2021, Hammer's fears came to fruition. On that day, Hammer was scheduled for a lactation break at 1:00 p.m., and went to the mechanical room to pump. When she arrived, she discovered the room was being used to interview a job candidate, so Hammer could not pump – a delay that caused her physical pain and discomfort. Hammer had to pump as soon as possible, and continuously checked the mechanical room waiting for it to become available. Finally, over 45 minutes later, Hammer was able to access the room. She entered the room and threw a sign on the door that the room was in use. However, shortly after she began, her male manager, Anthony Agati, walked in the room – seeing Hammer completely exposed. After being unexpectedly walked in on in such a vulnerable state, Hammer was scared and very shaken up.

50. Subsequently, Hammer told her manager, Monica Hubbell, and several of her coworkers about the incident. Incredibly, Hubbell laughed when she heard Hammer's complaint. Hubbell did not escalate Hammer's complaint or offer her a solution. It was clear that Trader Joe's would not comply with New York City's lactation room requirements and provide her with an adequate, private, lactation space. Hammer felt unsafe and no longer felt comfortable pumping during her workday.

51. Following this incident, Hammer's anxiety skyrocketed far beyond anything she normally experienced.

52. Upon information and belief, Hammer's experience is not unique; at least two other Trader Joe's locations – LES and Murray Hill – also rely on an unsanitary mechanical room in the event workers need a private place to express breastmilk.

*Hammer is Denied Healthcare Coverage and Constructively Discharged*

53. Throughout her employment, Hammer received health insurance through Trader Joe's. Upon giving birth to her child, Hammer's insurance covered her child as well.

54. In November 2021, Trader Joe's management held a pre-shift huddle. Right before employees were about to start their shift, employees were informed that Trader Joe's' healthcare coverage policy was changing. Employees were instructed to check Trader Joe's' employee portal to find out if they still qualified for insurance.

55. When she got home, Hammer immediately ran to her computer and nervously logged into the portal. Hammer's stomach dropped as she read that despite being a full-time employee at Trader Joe's for nearly three years, she did not meet the minimum threshold of hours to qualify for health insurance. Hammer panicked over what she would do if she lost health coverage for her and her newborn.

56. In examining how Trader Joe's calculated its minimum number of hours to qualify for insurance, it became clear that Trader Joe's was evaluating Hammer's hours without considering that she went on leave, essentially depriving her of a benefit afforded to all other employees and penalizing her for her maternity leave and parental status.

57. Trader Joe's' health care policy disparately impacted Hammer as a woman who took maternity leave.

58. Hammer was extremely distressed. She knew she needed health insurance for her and her family. She immediately got on the phone and tried to speak to any manager who could help her reverse what was, presumably, a policy oversight. Hammer spoke with several different managers at her store, including Hubbell and Antonik. They were unable to give her any concrete

answers about her eligibility for health insurance and they instructed her to contact Trader Joe's' corporate HR office.

59.     On November 13, 2021, Hammer's wife called Trader Joe's' corporate office and spoke with Benefits Administrator, Raquel Walters. Hammer's wife complained that the way Hammer's leave was accounted for in calculating her eligibility for health insurance was discriminatory.

60.     Hammer's wife specifically told Walters that if Hammer had not taken maternity leave, she would have been eligible to keep her health insurance. She stated that she felt like Hammer's leave was being used against her. Furthermore, Hammer's wife took the opportunity to tell Walters about the difficulties Hammer was facing as a new mom at Trader Joe's, and how Trader Joe's failed to provide Hammer with a lactation room. Walters responded callously, and without sympathy. She refused to address any of Hammer's complaints. Instead, Walters responded, "[e]veryone is given the same opportunities. If you work, you're eligible and if you don't, you're not." Hammer's wife then asked if there was any other HR representative she could speak to, if there was any way to have her eligibility reconsidered, or if there was an exception she could apply for. Walters simply repeated the new policy and said there was nothing she could do.

61.     Hammer's wife then recounted her conversation with Walters to Hammer. Hammer felt completely defeated; she had been a dedicated employee for almost three years, and she had even risked her physical safety throughout the pandemic for her job. She could not believe that Trader Joe's would heartlessly deny her and her family health insurance coverage because of her maternity status.

62.     Hammer felt that she had, at that point, exhausted all her options and there was nothing else she could do to rectify the situation. She had no choice other than to resign from her position at Trader Joe's and find alternative employment that offered health insurance.

*The Impact of Trader Joe's Actions on Hammer*

63. In December 2021, Hammer sought professional help and began working with a therapist to treat her worsening anxiety and intrusive thoughts.

64. After consulting with her therapist for months, Hammer decided to seek treatment with a health provider who could prescribe her medication for her worsening anxiety.

65. In April 2022, Hammer consulted with another health provider, who prescribed her medication. Hammer did not feel comfortable taking medication for anxiety while she was breastfeeding and therefore delayed as long as she could.

66. On May 1, 2022, Hammer started taking the prescribed medication. As a result, Hammer stopped breastfeeding earlier than she wanted to so that she could remove that source of anxiety and take her prescribed mediation without worrying about the effect it might have on her child.

67. Hammer felt profoundly disappointed and guilty about no longer providing milk to her child.

68. Hammer's last day of employment at Trader Joe's was December 12, 2021, and her benefits terminated December 31, 2021.

**FIRST CAUSE OF ACTION:**
**Discrimination in Violation of Title VII**

69. Hammer repeats and realleges each allegation set forth above.

70. Defendant unlawfully discriminated against Hammer in the terms and conditions of her employment by subjecting her to disparate treatment, on the basis of her caregiver status, sex, and pregnancy in violation of Title VII.

71. As a result, Hammer has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

13

72. Defendant willfully engaged in discriminatory practices with malice and/or reckless indifference to Hammer's federally protected rights.

73. Hammer is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

## SECOND CAUSE OF ACTION:
### Retaliation in Violation of Title VII

74. Hammer repeats and realleges each allegation set forth above.

75. Defendant unlawfully retaliated against Hammer for taking protected maternity leave and for making protected complaints of discrimination by revoking Hammer's healthcare coverage, in violation of Title VII.

76. As a result, Hammer has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

77. Defendant willfully engaged in discriminatory practices with malice and/or reckless indifference to Hammer's federally protected rights.

78. Hammer is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, interest, and costs.

## THIRD CAUSE OF ACTION:
### Discrimination in Violation of NYSHRL

79. Hammer repeats and realleges each allegation set forth above.

80. Defendant unlawfully discriminated against Hammer in the terms and conditions of her employment by, *inter alia*, subjecting her to disparate treatment on the basis of her caregiver status, sex, and pregnancy in violation of NYSHRL.

81. As a result, Hammer has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

82. Defendant willfully engaged in discriminatory practices with malice and/or reckless indifference to Hammer's rights.

83. Hammer is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

### FOURTH CAUSE OF ACTION:
### Retaliation in Violation of NYSHRL

84. Hammer repeats and realleges each allegation set forth above.

85. The retaliatory actions to which Hammer was subjected could have dissuaded reasonable employees in her position from taking protected maternity leaves.

86. As a result, Hammer has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

87. Defendant willfully engaged in discriminatory practices with malice and/or reckless indifference to Hammer's rights.

88. Hammer is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

### FIFTH CAUSE OF ACTION:
### Discrimination in Violation of the NYCHRL

89. Hammer repeats and realleges each allegation set forth above.

90. Defendant unlawfully discriminated against Hammer in the terms and conditions of her employment by subjecting her to disparate treatment on the basis of her sex, caregiver status, and pregnancy in violation of NYCHRL.

91. As a result, Hammer has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

92. Defendant willfully engaged in discriminatory practices with malice and/or reckless indifference to Hammer's rights.

93. Hammer is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

### SIXTH CAUSE OF ACTION:
### Retaliation in Violation of the NYCHRL

94. Hammer repeats and realleges each allegation set forth above.

95. Defendant retaliated against Hammer for her taking protected maternity leave and for making protected complaints of discrimination, including but not limited to complaints of inadequate lactation space, in violation of NYCHRL.

96. The retaliatory actions to which Hammer was subjected could have dissuaded reasonable employees in her position from taking protected maternity leave and/or from making protected complaints.

97. As a result, Hammer has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

98. Defendant willfully engaged in discriminatory practices with malice and/or reckless indifference to Hammer's rights.

99. Hammer is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorneys' fees, and costs.

### DEMAND FOR RELIEF

WHEREFORE, Hammer respectfully requests that this Court enter judgment in her favor as against Trader Joe's, in an amount to be determined by the trier of fact, on the First, Second, Third, Fourth, Fifth and Sixth Causes of Action, awarding emotional distress damages, punitive damages, attorney's fees, interest, and costs, and granting such other relief as may be just.

## DEMAND FOR TRIAL BY JURY

Pursuant to FRCP § 38(b), Hammer demands a trial by jury.

Dated: Brooklyn, New York
September 12, 2023

Respectfully submitted,

Hilary Orzick
Crumiller P.C.
16 Court St, Ste 2500
Brooklyn, NY 11241
(212) 390-8480
hilary@crumiller.com